1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA
2    ************************************************************
CERTAIN UNDERWRITERS AT
3    LLOYD'S LONDON, ET AL

4                                    Docket No. 22-CV-3874
                                     Section "L"
5    v.                              New Orleans, Louisiana
                                     Wednesday, December 21, 2022
6
BELMONT COMMONS, LLC, ET AL
7    ************************************************************

8
                TRANSCRIPT OF MOTION PROCEEDINGS
9         HEARD BEFORE THE HONORABLE ELDON E. FALLON
                UNITED STATES DISTRICT JUDGE
10

11
APPEARANCES:
12
FOR THE PLAINTIFF:           ADAMS HOEFER HOLWADEL
13                           BY:  PHILLIP J. REW, ESQ.
                             400 Poydras St., Suite 2450
14                           New Orleans, LA 70130

15

16   FOR THE DEFENDANT:          LANE LAW GROUP
                             BY:  MICHAEL D. LANE, ESQ.
17                           900 Camp St., Suite 4C4
                             New Orleans, LA 70130
18

19
Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR, RMR
20                           500 Poydras Street, B-275
                             New Orleans, Louisiana 70130
21                           (504) 589-7776

22

23
      Proceedings recorded by mechanical stenography, transcript
24   produced by computer.

25

```
 1                   P R O C E E D I N G S

 2              (WEDNESDAY, DECEMBER 21, 2022)

 3                 (MOTION PROCEEDINGS)

 4

 5       (OPEN COURT.)

 6            THE COURT:  Let's go to the next one, Dean, it's the

 7  Lloyd's.

 8            THE DEPUTY CLERK:  Civil Action 22-3874, Certain

 9  Underwriters at Lloyds London, et al v. Belmont Commons, LLC, et

10  al.

11            THE COURT:  Counsel, make their appearance for the

12  record, please.  Sorry to keep you all waiting, thanks for your

13  patience.

14            MR. REW:  Good morning, your Honor.  Phillip Rew with

15  Adams, Hoefer, Holwadel on behalf of the 11 insurers, who are the

16  plaintiff in the principal action and that subset of nine insurers

17  that are defendants in the consolidated action.

18            THE COURT:  Okay.

19            MR. LANE:  Good morning, your Honor.  Michael Lane on

20  behalf of Belmont Commons, LLC and Belmont Delaware, LLC in both

21  actions.

22            THE COURT:  Okay.  This litigation arises from alleged

23  damage to a Belmont property as a result of Hurricane Ida -- looks

24  like today we're talking about hurricanes, this is another one,

25  Hurricane Ida.  The petitioner in this case or the defendants
```

10:06:25 1  initially were seven insurance companies who jointly subscribed to

10:06:32 2  a policy.  This is a Lloyds policy; seven of them are defendants

10:06:38 3  here, and nine of those insurers are United States, domestic

10:06:51 4  insurers, and two of them are international.  So there's 11

10:06:56 5  insurers on this subscription, nine are domestic to the United

10:07:03 6  States, two are international.

10:07:06 7       Belmont, as a property owner, filed suit first in

10:07:13 8  Louisiana state court against the nine domestic insurers only

10:07:19 9  claiming entitlement to additional compensation as a result of

10:07:23 10 Hurricane Ida.

10:07:28 11      The petitioners filed a complaint to compel arbitration.

10:07:32 12 They say that the policy provides for arbitration in, I think, New

10:07:42 13 York is where it was supposed to be.  The state action was removed

10:07:48 14 to this court.

10:07:52 15      There's no question the policy contains an arbitration

10:07:57 16 agreement.  It requires that all matters that the parties differ on

10:08:07 17 that's related to the policy be referred to an arbitration tribunal

10:08:11 18 in New York state and New York law applies.  Lloyds argues that the

10:08:17 19 arbitration agreement is valid and enforceable, and, therefore,

10:08:24 20 this matter should be stayed and sent to arbitration.

10:08:29 21      Now, we know under the law that a Court must compel

10:08:35 22 arbitration if four criteria are met:  The first criteria is that

10:08:41 23 there's a written agreement to arbitrate the matter; the second is

10:08:47 24 that the agreement provides for arbitration in a convention

10:08:52 25 signatory nation; third, the agreement arises out of a commercial

10:09:00  1   legal relationship; and four, a party to the agreement is not an

10:09:06  2   American citizen.  There's no question that the three provisions

10:09:11  3   apply here and the parties agree with that; but the last criteria,

10:09:20  4   at least for 11 -- excuse me, nine of the 11, they are American

10:09:27  5   citizens.

10:09:29  6          So the question before me is whether you can surgically

10:09:34  7   remove those nine insurers from the policy and sue them and not

10:09:47  8   have the arbitration agreement of the policy come into play.

10:09:53  9          This is a Lloyds policy, and we know from our maritime

10:10:01  10  experience that this Court confronts that often, and the Lloyds

10:10:09  11  policies come about by a broker.  A Lloyds person comes before

10:10:23  12  Lloyds and says, "I've got this risk."  And they go to the person

10:10:30  13  who is most qualified at Lloyds to assess that risk, and that

10:10:36  14  individual generally takes a percentage of that risk and passes it

10:10:43  15  on to his colleague in the office next to him, or the cubical it

10:10:48  16  used to, in the cubical next to him, and that individual only

10:10:54  17  insures race horses or vessels and not buildings.  But the person

10:11:03  18  who is an expert in insuring buildings took a certain percentage

10:11:09  19  and the other person who insures race horses says that was a high

10:11:15  20  percentage, so I'm going to get in on this risk and I buy a

10:11:20  21  percentage of it, and they take a percentage and it goes that way

10:11:25  22  until the risk is bound 100 percent.

10:11:34  23         When premiums are paid, the premiums are allocated

10:11:37  24  according to the percentage that each of the named risk managers

10:11:47  25  assumed, and they're bound together in one policy.  Belmont says

10:11:58  1   that you should be able to surgically remove nine from that policy

10:12:05  2   because they don't satisfy the fourth requirement.  Lloyds takes

10:12:11  3   the position that you can't remove that.  I'll hear from the

10:12:17  4   parties.

10:12:18  5          MR. REW:  Thank you, your Honor.  Your summary of the

10:12:21  6   insurance arrangement is pretty accurate.  The only difference here

10:12:25  7   is Lloyds is only 17.5 percent of this policy; HDI, the German

10:12:33  8   insurer, is 4.5 percent, and the remaining nine domestic carriers,

10:12:38  9   88 percent.  Which means that if a penny is paid to the plaintiffs,

10:12:46 10   17 percent of that penny is Lloyds, 4.5 is HDI, and 88 percent in

10:12:55 11   various ratios are the nine domestic insurers.  What the plaintiff

10:13:00 12   has seized on is that contract allocation endorsement spelling out

10:13:04 13   the percentage of risks subscribed to by each insurer in exchange

10:13:07 14   for the percentage of premiums received.

10:13:11 15          This is not an uncommon argument, but what it comes down

10:13:16 16   to, your Honor, is there is one account policy form and this is it

10:13:21 17   as to all 11.  They're all listed on this account policy.  Every

10:13:26 18   coverage that the plaintiff seeks to recover under is contained

10:13:30 19   herein.  Every exception or exclusion that the insurers would rely

10:13:36 20   on is also set forth herein - every sub-limit, every deductible,

10:13:41 21   every condition.  It's here and nowhere else.

10:13:52 22          Now, there is worth noting that this is a surplus lines

10:13:55 23   policy, it's issued under Louisiana surplus lines law.  Surplus

10:13:59 24   line insurers are technically referred to as unauthorized insurers,

10:14:03 25   they don't participate in the LIGA program.  They also by law are

10:14:09  1    not required to have their forms approved.  These are people who

10:14:12  2    underwrite risks that authorized insurers, LIGA insurers, are not

10:14:20  3    willing to undertake.  These are not small residential risks, these

10:14:23  4    are large commercial risks, unusual risks, running into the

10:14:28  5    millions, tens of millions, and we have some cases involving

10:14:31  6    hundreds of millions of dollars.  And the surplus line issue will

10:14:36  7    be relevant to us in a moment.

10:14:38  8            But I want to point out to the Court that in the matter

10:14:41  9    of *Port Cargo Services v. Certain Underwriters of Lloyds*, and

10:14:46 10    that's Civil Matter 18-6192, the plaintiff in that case made the

10:14:51 11    same argument.  The plaintiff in that case seized on the same

10:14:54 12    language and the contract allocation endorsement and said we have

10:14:57 13    11 different contracts here.  They've tried to remand the claims

10:15:03 14    against the domestic insurers, they tried to resist arbitration

10:15:09 15    with the domestic insurers.

10:15:10 16            And the Court recognized in *Port Cargo*, and I'll quote

10:15:14 17    the language, "Although the insurance policy states that plaintiffs

10:15:17 18    have separate contracts with each insureds, there is one insurance

10:15:22 19    policy document that sets forth the terms and conditions of the

10:15:25 20    coverage on the risk." And that's exactly what we have here, your

10:15:30 21    Honor.

10:15:30 22            THE COURT:  I've got your argument.

10:15:34 23            MR. REW:  Well, I do want to circle around here then.  We

10:15:37 24    have made the argument that there is collateral estoppel at play in

10:15:42 25    this case; plaintiff says it does not apply because it's decided

10:15:45  1  under Texas law.  What we haven't discussed in our brief, because,

10:15:49  2  frankly, when I was preparing for this case last night I hit Lexis

10:15:54  3  again, and came upon this Court's decision in *Norcom, Inc. v. CRG*

10:16:00  4  *International*, it's from 2002, Civil matter 01-3571.  And there are

10:16:09  5  a lot of important takeaways.  I don't know -- I've never been

10:16:13  6  before you, but someone in my office tells me you remember

10:16:16  7  everything.  I don't know if you remember the facts in *Norcom*

10:16:20  8  20 years later.

10:16:21  9          THE COURT:  Yes, I do.

10:16:23  10          MR. REW:  But there are some important takeaways from

10:16:26  11  *Norcom*.  The first off is that this Court applied *Grigson* to a

10:16:28  12  Louisiana case arising under Louisiana law because it is the law of

10:16:33  13  the Fifth Circuit, not just Texas.

10:16:34  14          THE COURT:  Right.

10:16:35  15          MR. REW:  The second thing that this Court gave us in

10:16:38  16  *Grigson* was that a plaintiff cannot plead its way out of

10:16:40  17  arbitration, it can't spin the argument one way or another and

10:16:47  18  change the underlying facts; and that's what the Court said in

10:16:51  19  *Norcom* citing *Grigson* in *Harvey v. Joyce*, that the inquiry is to be

10:16:57  20  guided by the underlying facts and not the labels and pleadings

10:17:00  21  used by the plaintiff.

10:17:01  22          And the third thing that this Court's ruling gives us

10:17:05  23  from *Norcom* is that when we're looking at *Grigson*-type estoppel,

10:17:12  24  interrelated claims, interrelated conduct, intertwined claims, is

10:17:17  25  that the alleged interrelation of these claims does not have to be

10:17:23  1   identical.  There was a telecom service provider who was a

10:17:27  2   defendant and they were signatory to a contract, an arbitration

10:17:33  3   agreement, and the claims against them were declaratory judgment,

10:17:36  4   breach of contract, and conversion.  From other facts arising from

10:17:41  5   the same controversy against the non-signatory, the claims were

10:17:46  6   fraud, tortious interference with contract, and unfair trade

10:17:51  7   practices.  What the Court did there was look at the underlying

10:17:54  8   facts and realize that all claims arose from that agreement between

10:17:59  9   the plaintiff and that telecom service provider, which had an

10:18:05  10  arbitration clause.

10:18:06  11       The argument here is, well, we have 11 agreements.  We

10:18:09  12  submit, your Honor, that the common facts -- and we've discussed

10:18:13  13  them several times in our pleading -- illustrate that this is one

10:18:18  14  course of action, this is one -- the nexus of facts here is so

10:18:23  15  strong that if we were to instead turn around and try to sever

10:18:26  16  these into nine different actions, we would probably encounter the

10:18:32  17  argument that there are substantial issues of fact involved.

10:18:36  18       And we laid them out, we have one adjuster, we've

10:18:40  19  conducted one inspection which the plaintiff says gives proof of

10:18:43  20  loss to the entire market, there is one estimate that the plaintiff

10:18:47  21  says underreports it and is the product of manipulated software

10:18:52  22  which allegedly the entire market did.

10:18:56  23       I don't want to belabor the point, your Honor, just

10:18:59  24  because I appreciate that you're familiar with the pleadings.

10:19:05  25       One thing I want to get back to here and that is the

10:19:08  1    arbitration demand.  They filed a lawsuit -- and this is really

10:19:11  2    what provoked our filing of the action to compel arbitration on

10:19:16  3    behalf of the entire market.  They sued nine domestic carriers.

10:19:20  4    There's no question why they did that.  They did that to circumvent

10:19:24  5    arbitration because there are dozens, several dozen cases

10:19:29  6    throughout the Fifth Circuit, hundreds around the country, in which

10:19:32  7    courts have ordered arbitration on the same arbitration agreement

10:19:36  8    by these same insurers.

10:19:39  9         When they make the arbitration demand, they don't make it

10:19:42 10    as to the nine insurers, they make it as to all 11 - foreign and

10:19:47 11    domestic alike.  And they don't ask for 11 arbitrations, they

10:19:51 12    ask -- they tell the Court -- I would like to use that, but I am

10:19:57 13    not familiar with this device, my apologies.

10:20:00 14         THE COURT:  I really understand your argument, and I am

10:20:03 15    familiar with *Norcom*, I mean, I wrote it.  I would like to hear

10:20:08 16    from your opposing counsel.

10:20:12 17         But let's just take a three minute or four-minute break

10:20:16 18    at this time.  I'll be right back.  The Court will stand in recess.

10:20:20 19         THE DEPUTY CLERK:  All rise.

10:20:21 20      (WHEREUPON, A RECESS WAS TAKEN.)

10:24:18 21      (OPEN COURT.)

10:24:20 22         THE COURT:  Okay.  Let me hear from you.  This is a

10:24:23 23    situation:  Lloyds, the whole structure of Lloyds is that way,

10:24:28 24    percentages; and then in this particular case, to make it even more

10:24:34 25    difficult, they're on a percentage and the claim is against them --

10:24:42 1   I mean, it's just hard to say the claim against the nine is

10:24:45 2   different from the claim against the two.  I mean, it's a claim,

10:24:49 3   the same claim against the 11 that you would make.  How can you

10:24:58 4   surgically do that?

10:24:59 5           MR. LANE:  Well, your Honor, we're not asking to

10:25:02 6   surgically remove anything.  What we're doing here is arguing that

10:25:06 7   the domestic carriers who carry 80 plus percent of the risk do not

10:25:12 8   have a right to force arbitration.  They are non-signatories

10:25:17 9   according to the Fifth Circuit, the U.S. Supreme Court, and this

10:25:20 10  Court to the arbitration clause.  So what that -- because otherwise

10:25:24 11  they would not be able to enforce the arbitration clause pursuant

10:25:28 12  to Revised Statute 22:868.  They are non-signatories.  It's not a

10:25:34 13  single policy.  Their own policy that they wrote says this is

10:25:38 14  11 separate contracts and that's undisputed.  The courts have all

10:25:43 15  held these are separate contracts, they have several liability for

10:25:47 16  only their proportion of their risk.

10:25:50 17          And I want to clarify.  You're characterizing this as a

10:25:54 18  Lloyds policy.  These insurance companies are not typical

10:25:57 19  subscribers.  I have been to London, I used to represent Lloyds

10:26:01 20  early in my career, and they have syndicates - Amlin, Brit, Kaplan,

10:26:07 21  etc.  That's not what we're talking about here as far as the 80/20

10:26:10 22  split.  The 80 percent of the domestic carriers are completely

10:26:14 23  separate, well-known insurance companies - Lexington Insurance

10:26:17 24  Company, Steadfast Insurance Company, Republic Union Insurance

10:26:22 25  Company - these are not Lloyds entities.  So what has happened

10:26:25  1    here --

10:26:26  2            THE COURT:  But aren't they on the same policy?

10:26:28  3            MR. LANE:  Well, they're separate policies according to

10:26:30  4    their own language, your Honor.  And what that means is that the

10:26:33  5    non-signatories, the third parties have to go through the doctrine

10:26:38  6    of equitable estoppel, which I'm sure the Court is well aware of,

10:26:42  7    to be able to enforce the arbitration clause.  They don't have an

10:26:46  8    independent right to do that because if Louisiana law applies, the

10:26:49  9    arbitration clause is null and void.

10:26:52  10           And what I think is the main differentiating factor in

10:26:56  11   this case -- there's three reasons why this case is different than

10:26:58  12   all of the other cited cases, Judge.  One is they have not

10:27:03  13   addressed our equitable estoppel argument, which is that under the

10:27:07  14   Louisiana tradition and laws going back to 1808, equitable

10:27:12  15   estoppel -- and the courts have held this since 1945 -- equitable

10:27:16  16   estoppel cannot be applied in Louisiana unless there is an absence

10:27:21  17   of express law.  And what they're trying to do is apply equitable

10:27:25  18   estoppel in violation of not one but four Louisiana laws on the

10:27:30  19   books for decades.

10:27:33  20           Equity is a remedy -- and the U.S. Supreme Court has

10:27:37  21   recently said this as well, the convention does not displace state

10:27:41  22   law or domestic law.  Domestic law still applies as far as the

10:27:46  23   formation of the contract and determining who is bound by the

10:27:49  24   arbitration agreement.  So you have -- and this is an argument,

10:27:52  25   your Honor, that I don't believe has been addressed by any of the

10:27:55  1   cases cited by the insurance companies or any of the cases that I

10:28:00  2   have seen.  No one has addressed the Louisiana application of

10:28:04  3   equitable estoppel and this argument, and that's one major

10:28:07  4   differentiating factor in this case.  They say this should be a

10:28:11  5   routine motion to compel; it's not because this is a novel issue

10:28:15  6   that the courts have, frankly, not addressed.

10:28:19  7          THE COURT:  But isn't the nine that you want to proceed

10:28:23  8   against liable because of one policy?  That they're part of the

10:28:27  9   policy?  Aren't the nine the same as the two on that responsibile

10:28:34 10   because of the policy that insures Belmont?

10:28:37 11          MR. LANE:  It's not the same policy, your Honor.  There

10:28:40 12   are 11 separate contracts per their own --

10:28:42 13          THE COURT:  Eleven different policies?

10:28:43 14          MR. LANE:  That's what their own contract says.  The

10:28:46 15   contract allocation endorsement says these are separate contracts.

10:28:49 16   It says it four or five times.  These are separate contracts.  And

10:28:52 17   the courts have all held that domestic insurance companies who have

10:28:56 18   this exact same setup of domestic and international, the domestic

10:29:02 19   carriers are non-signatories to the arbitration clause because it's

10:29:06 20   invalid.

10:29:06 21          THE COURT:  But if we tried the case against the nine and

10:29:10 22   there's findings of fact, conclusions of law, won't that be

10:29:15 23   applicable to the two?

10:29:17 24          MR. LANE:  Well, your Honor, that's how they set this

10:29:20 25   policy up.  They have to bear the --

10:29:20  1          THE COURT:  I mean, but won't it be applicable to the

10:29:22  2     two?  I mean, how can you take one policy and hold that this policy

10:29:30  3     is either -- that these people are liable because they're part of

10:29:37  4     the policy and then say the two who have arbitration provisions are

10:29:44  5     not liable because they have arbitration?

10:29:46  6          MR. LANE:  Well, your Honor, that goes to the second

10:29:48  7     reason why this is a different case than all of the other cases.

10:29:52  8     We have issued discovery requests to determine what acts were done

10:29:56  9     by each of these separate insurance companies.  The insurance

10:29:59 10     companies, as they do in everyone of these cases, and I have

10:30:03 11     several others, have said we all did the same thing:  We assigned

10:30:07 12     one third-party administrator, we assigned one adjuster, we did one

10:30:11 13     inspection.  But they have not refuted any of the allegations in

10:30:14 14     our petition, which specifically allege that these insurance

10:30:17 15     companies all had their own underwriting files, all had their own

10:30:21 16     claim files, had their own desk adjusters who had the right to make

10:30:25 17     independent determinations of coverage issues, all 11 of them did.

10:30:30 18     They haven't refuted any of that.

10:30:32 19          THE COURT:  So you take the position that each of them is

10:30:36 20     responsible for a different reason?

10:30:38 21          MR. LANE:  Well, your Honor, they haven't provided us any

10:30:41 22     of the discovery responses that we requested four months ago when

10:30:43 23     we filed the suit.  We have a pending motion to compel those

10:30:47 24     responses.  And they want the Court to take its word that we didn't

10:30:51 25     do anything different, these companies acted in a concerted and

10:30:56  1   interdependent way in all respects; but that's not been proven,

10:31:00  2   there's been no affidavits, sworn documents, competent summary

10:31:03  3   judgment evidence, nothing.  And so we have to say, well, Judge, if

10:31:08  4   what they're saying is true, show us the documents, show us the

10:31:11  5   communications between the insurance companies and their respective

10:31:13  6   adjusters.  Did they discuss --

10:31:16  7        Because I think one thing we need to understand and make

10:31:19  8   clear is they paid zero dollars on this policy.  This is a

10:31:22  9   $7 million claim on a building in downtown New Orleans only a few

10:31:26 10   blocks from here.  This isn't we got paid and we need more money,

10:31:29 11   they completely denied this claim.  And we don't know if four of

10:31:34 12   these carriers said, "You know what.  I think we should pay a

10:31:37 13   million dollars," and then the other seven said, "No, we're

10:31:41 14   inclined to just deny the claim on these coverage grounds."  We

10:31:44 15   don't know that.  They want the Court to assume that they all made

10:31:47 16   the same determination in concert with each other, but that has not

10:31:52 17   been proven and so we have asked for that discovery.

10:31:54 18        THE COURT:  So your argument is that it's not one policy,

10:31:56 19   it's 11 policies?

10:31:58 20        MR. LANE:  That is correct.  And they have 11 separate

10:32:01 21   insurance claim numbers on this, they have 11 separate desk

10:32:05 22   adjusters assigned to these claims.

10:32:08 23        But I think one more -- there's one more factor.  So

10:32:12 24   there's three reasons why the Court should deny the motion to

10:32:16 25   compel.  One is the equitable estoppel argument.  If you look at it

10:32:20  1    in their brief, they don't even respond to it.  We have said

10:32:23  2    Louisiana law has made clear for decades since 1945, you cannot

10:32:29  3    apply that doctrine under our civilian tradition in the -- unless

10:32:33  4    there's an absence of express law.

10:32:36  5            There's four laws that the arbitration clause violates.

10:32:39  6    It violates 868(a)(2) which says you cannot force us to arbitrate;

10:32:47  7    it violates (a)(1) of the same statute, and it violates two other

10:32:52  8    statutes which we've addressed.

10:32:53  9            So there are three factors that are different:  One is

10:32:56 10    they haven't even addressed or refuted or cited a single case to

10:33:00 11    refute the equitable estoppel argument that we have presented to

10:33:04 12    the Court, which is a novel argument that none of the other courts

10:33:06 13    have addressed.

10:33:07 14            No. 2 is -- sorry, I need some water.  Do we have any

10:33:12 15    water anywhere?

10:33:14 16            THE COURT:  Wait just a minute.

10:33:16 17            MR. LANE:  No. 2, your Honor, is discovery responses.

10:33:18 18    Nobody has provided any discovery and they have alleged conduct,

10:33:21 19    they have not proven it, there is no basis to believe their

10:33:25 20    allegations are true versus our allegations that they're not true.

10:33:28 21            And No. 3, I think another important factor, your Honor,

10:33:31 22    quickly, is they did not timely opt out of the streamlined

10:33:37 23    settlement program in our lawsuit.  They had 15 days from the date

10:33:41 24    they filed their answer in that lawsuit, it's a consolidated case,

10:33:45 25    they didn't do it.  They waited until 20 something days.

10:33:53  1          And Judge Vitter just addressed this exact same issue,

10:33:57  2     exact same situation, the same exact insurance companies on the

10:34:01  3     same exact type of policy of an 80/20 split,

10:34:06  4     domestic/international.  They did timely opt out in her case, it

10:34:09  5     was the *Friends of Young Audiences Charter School* case, decided

10:34:12  6     either Monday or sometime last week.  They didn't timely opt out,

10:34:16  7     and she said you elected to be bound by the streamlined settlement

10:34:20  8     protocol in place for Hurricane Ida claims.

10:34:23  9          We made that same argument before Judge North or

10:34:26 10     Magistrate North when we filed our motion to compel.  We notified

10:34:30 11     the Court that they did not opt out, and therefore, they were bound

10:34:32 12     by the SSP.  And so on the same grounds, before Judge Vitter even

10:34:38 13     ruled, we pointed that out to the Court that they refused to

10:34:40 14     participate.  And so that's a third separate basis that we've

10:34:43 15     argued that this motion to compel should be denied.

10:34:45 16          THE COURT:  Okay.  All right.  Let me hear a response.

10:34:49 17          MR. REW:  Respond briefly, your Honor.

10:34:52 18          THE COURT:  He takes the position that this is in effect

10:34:55 19     11 policies and not one policy.

10:34:57 20          MR. REW:  That is understood that they've made that

10:35:02 21     argument, your Honor, and yet nothing contravenes the fact that

10:35:07 22     there is the abundance of common issues of fact and law here.  If

10:35:12 23     we go back to *Norcom*, there was one party had a contract, one party

10:35:17 24     had no contract at all; and nonetheless, this Court ordered the

10:35:21 25     arbitration in that matter.

10:35:22  1        I think you brought up a very important issue, your

10:35:25  2   Honor, and that is we have two international insurers in this case.

10:35:29  3   Those two international insurers under the Convention for the

10:35:34  4   Recognition and Enforcement of Arbitral Awards inarguably are

10:35:38  5   entitled to enforce this arbitration agreement.

10:35:41  6        In *Port Cargo*, the court found that was very problematic

10:35:44  7   to suggest that we would have an arbitration as to two while

10:35:47  8   running a parallel litigation as to the remainder that could

10:35:51  9   effectively destroy the arbitration rights of the two.

10:35:54  10        And as you held in *Figear*, there is a compelling federal

10:36:00  11   interest in enforcing arbitration agreements which applies with

10:36:04  12   special force in international arbitration agreements falling under

10:36:08  13   the convention.

10:36:08  14        You also, I believe it was in the case of *Olsher*, held

10:36:12  15   that same problem of litigating certain claims of certain

10:36:17  16   defendants while arbitrating as to other defendants would also

10:36:23  17   effectively deprived those defendants, in this case the

10:36:26  18   international insurers, of their right to arbitration.

10:36:30  19        THE COURT:  What's the answer to his question that you

10:36:32  20   haven't given him material to show him that it's one policy as

10:36:36  21   opposed to 11 policies?

10:36:39  22        MR. REW:  Well, this is what's curious to me, your Honor,

10:36:41  23   is that plaintiff filed suit in CDC, which has its own version of

10:36:46  24   the SSP.  That discovery that they want doesn't fall under the SSP

10:36:53  25   that's in place in CDC, it doesn't fall under the SSP that's in

10:36:59   1   place here.  The proposition the plaintiff has is that if I plead

10:37:02   2   my case the right way, I can get this big massive discovery; and no

10:37:06   3   matter what you find, no matter if one insurer says "maybe this is

10:37:12   4   covered, maybe it's not," all 11 insurers collectively in one below

10:37:19   5   deductible letter informed the insured that their claim was denied.

10:37:28   6         If we were to turn around and argue, well, four of these

10:37:31   7   people aren't in bad faith because they maybe thought about it,

10:37:36   8   using their example.  The end of the day, they're still bound by

10:37:40   9   that below deductible letter.  This is a routine insurance claim.

10:37:44  10   There's a claim -- there's a policy, there's a loss, there's a

10:37:48  11   claim, there's an inspection, an adjustment, and the resolve of

10:37:53  12   this case it was a denial.

10:37:55  13         We have responded to all of these allegations that

10:37:57  14   plaintiffs have made.  Plaintiffs have insisted that there is --

10:38:02  15   equitable estoppel does not apply under Louisiana law.  I

10:38:08  16   offered -- I shortcut that because it is in our pleadings.  But we

10:38:13  17   provided this Court with several Louisiana state law decisions,

10:38:17  18   which according to the plaintiffs are wrong, and which *Grigson*

10:38:22  19   specifically, *Grigson* and its estoppel were applied by Louisiana

10:38:26  20   state law cases, Fourth Circuit cases.  And if plaintiff is right,

10:38:32  21   every equitable estoppel case decided under *Grigson* in Louisiana

10:38:37  22   for the last 25 years, out the window.  I would submit to this

10:38:42  23   court that every court that decided that got it right.

10:38:47  24         Plaintiff wants this discovery, your Honor.  I would go

10:38:50  25   back again to figure where it was instructed.  It's a very limited

10:38:55  1    inquiry to advance the compelling interests of the federal

10:38:59  2    government in enforcing arbitration.  It doesn't say disgorge truck

10:39:04  3    loads of documents.  It says -- it has four issues to be addressed.

10:39:12  4    In this case the plaintiff wants to say we did not opt out of the

10:39:16  5    SSP and yet they want to conduct discovery outside of the SSP.

10:39:20  6    There's really no way to have both.

10:39:22  7          We submit also, plaintiff emphasizes that in the removed

10:39:26  8    action 3876 our opt out was not timely.  But the party may opt out

10:39:33  9    within 15 days of the defendant filing their responsive pleadings.

10:39:38 10    The preliminary action here is 22-3874, the action by all 11

10:39:45 11    insurers as against the plaintiffs to enforce the arbitration

10:39:51 12    agreement and compel arbitration.  Plaintiffs did not answer -- did

10:39:58 13    not file their answer in that case, did not file the responsive

10:40:01 14    pleading that triggers the opt out period until after we had filed

10:40:05 15    our opt out in that case.

10:40:07 16          With regards to the principal action here, the opt out is

10:40:12 17    entirely timely.  We submit that it should be granted and -- I

10:40:22 18    believe it was Judge Douglas?

10:40:26 19              THE COURT:  Vitter.

10:40:27 20          MR. REW:  No.  We recently received an opt out from the

10:40:32 21    district judge who said in light -- from a magistrate judge which

10:40:37 22    said, in light of the compelling federal interest and enforcing

10:40:41 23    arbitration agreements and because there is an arbitration

10:40:44 24    agreement here, they granted the opt out.  It was the matter of

10:40:49 25    *Dupuy*, D-U-P-U-Y.  I apologize that just came in either Thursday or

10:40:55  1   Friday.

10:40:56  2                  THE COURT:  That's all right.

10:40:56  3        MR. REW:  But to summarize, your Honor, we have answered

10:41:00  4   the equitable estoppel argument, we have opted out.  And this

10:41:03  5   discovery, it's a fishing expedition.  They tell you, oh, there's

10:41:07  6   different policies, there's different files, there's all of this.

10:41:10  7   Where is the proof to support that?  Where is the evidence?  It's

10:41:14  8   speculation to say open the flood gates on discovery allowing

10:41:20  9   merit-based discovery.  Again, as we've cited in our pleadings,

10:41:24 10   courts have consistently denied that merit-based discovery.

10:41:28 11        We would submit to the Court that this is a routine claim

10:41:31 12   and there is no reason, no matter how it's styled, no matter what

10:41:36 13   manipulation, suing some, demanding arbitration against all,

10:41:41 14   reserving these claims as to the foreign insurers, this is window

10:41:47 15   dressing, but the facts remain that this was --

10:41:53 16                  THE COURT:  Okay.  All right.  I got it.  Let me take

10:41:56 17   another look at it in view of what both of you all have said.  I'll

10:42:00 18   be coming out with my opinion very shortly.  Thank you very much.

10:42:02 19                  MR. LANE:  Your Honor, can I make just one brief remark?

10:42:04 20                  THE COURT:  Yes, sure, go ahead.

10:42:05 21                  MR. LANE:  Counsel just referred to this as window

10:42:08 22   dressing.  I'm referring to the Louisiana civilian doctrine that

10:42:13 23   goes back to 1808, and they have cited one, if I recall correctly,

10:42:18 24   one Louisiana decision that applied equitable estoppel under

10:42:24 25   *Grigson*, did not address this issue whatsoever.  I've read every

10:42:28 1    single one of these decisions.  Not a single court has addressed

10:42:31 2    the argument presented to you today that *Grigson* estoppel doesn't

10:42:34 3    apply because there is no absence of express law.

10:42:37 4            And I'll just close with this, your Honor, *Grigson*

10:42:41 5    estoppel, *Grigson* itself decided in 2007 said every case turns on

10:42:45 6    its merits, every case is determined on the fundamental basis of

10:42:48 7    fairness, that's the lynchpin of estoppel, and every court has the

10:42:53 8    discretion and must exercise its discretion in determining whether

10:42:56 9    estoppel applies.  So to assume and argue and suggest that every --

10:42:59 10   this is a routine case and the Court should rubber stamp the

10:43:03 11   arbitration order like all of the other courts have done, defies

10:43:07 12   *Grigson* itself which says the courts have the discretion to

10:43:11 13   determine if equitable estoppel applies, and they've cited nothing

10:43:14 14   in Louisiana law that says it does not.

10:43:16 15           THE COURT:  All right.

10:43:16 16           MR. REW:  Very briefly, your Honor.  I believe we've got

10:43:20 17   five or six cases cited here, Louisiana courts applying *Grigson*.

10:43:23 18           THE COURT:  Okay.

10:43:23 19           MR. REW:  And we're not submitting it's a rubber stamp,

10:43:26 20   we're submitting that the same arbitration clause with the same

10:43:29 21   defendants from what is essentially a routine insurance claim

10:43:33 22   warrants the same results.

10:43:34 23           THE COURT:  All right.  Thank you both.  I appreciate it.

24           (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

25

```
 1                    *  *  *  *  *  *

 2

 3

 4                    REPORTER'S CERTIFICATE

 5

 6        I, Karen A. Ibos, CCR, Official Court Reporter, United

 7   States District Court, Eastern District of Louisiana, do hereby

 8   certify that the foregoing is a true and correct transcript, to the

 9   best of my ability and understanding, from the record of the

10   proceedings in the above-entitled and numbered matter.

11

12

13                         /s/ Karen A. Ibos

14                    Karen A. Ibos, CCR, RPR, CRR, RMR

15                    Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```